# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

AUTUMN CAIN,  )
    Plaintiff,  )
       )    **Case No.** _____
v.  )    **JURY DEMANDED**
       )
CHATTANOOGA RECOVERY  )
CENTER, LLC,  )
    Defendant.  )

## COMPLAINT

1.     Plaintiff, Autumn Cain, is a resident of Madison, Alabama.

2.     Defendant, Chattanooga Recovery Center, LLC ["CRC"], is a Limited Liability Company with its principal place of business located in Chattanooga, Tennessee. Its registered agent for service of process is Charles G. Fisher, 633 Chestnut Street, Suite 900, Chattanooga, Tennessee 37450.

3.     This action is filed pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e ["Title VII"].  The foregoing statute provides in pertinent part that all employees should be protected from, *inter alia*, discrimination in employment and that all employees' interests in dignity and freedom from humiliation should be protected.

4.     This Court has federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331 (Original Jurisdiction).

5.     This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) and (c).

6.     CRC, and its sister companies, employs more than 500 employees. Graceland Recovery Center, LLC, Green Acres Wellness, LLC, along with the CRC, make up the organization and are all owned by one person, Miles Neal ["Neal"].

1

7. CRC is a mental health and drug rehabilitation facility located in Chattanooga, Tennessee. CRC offers services to treat mental health disorders and drug and alcohol addiction through intensive outpatient programs, medication assisted programs, night outpatient programs, and partial hospitalization programs.

8. Plaintiff has a M.S. in clinical mental health and a B.S. in substance abuse counseling. She has operated clinics that are larger than the size of CRC for many years.

**INTERN TO DIRECTOR**

9. In August 2022, Plaintiff was hired by Defendant as a part time intern with a caseload comparable to the full-time therapists. Plaintiff was an intern until January 1, 2023. During that time, she operated two Massage Envy clinics during the day and worked at CRC at night.

10. On or about January 1, 2023, Plaintiff transitioned into a part-time therapist role. On or about February 2023, the director at that time of her hire, Bill Brown ["Brown"], approached Plaintiff to inquire about her interest in taking over his position as director. Brown was leaving the Chattanooga facility to help open the detox center that opened in August 2023.

11. A meeting took place in Carrollton, Georgia, where Plaintiff met with Neal, Jacob Pressley ["Pressley"], Brown, and Bill Knick ["Knick"] to speak about the director position shortly after Brown spoke with Plaintiff to see if she was interested. They discussed with Plaintiff their expectations and asked what she wanted for her base salary. She explained that it should be comparable to what she was making, around $75,000.00 plus bonuses. After the conclusion of the meeting, Brown told Plaintiff that Neal made the comment "she's hot" but said nothing else about her qualifications and endorsed her promotion into the director role.

2

12. A few weeks later, Plaintiff met with Pressley and Brown in Chattanooga to discuss salary. Pressley offered $70,000.00 in salary although it was clear from the first meeting, she needed over $70,000.00 to be comparable. He eventually agreed to give Plaintiff $75,000.00 but made the comment "if it helps you sleep at night."

13. Plaintiff first met Pressley through a dating app. When Plaintiff mentioned interning with CRC, he was hesitant because he did not want that to impact his ability to date Plaintiff. He would send her romantic text messages and she would reply in a respectful manner, declining his intentions to pursue her romantically.

14. Plaintiff continued with CRC as a therapist until May 2023.

15. On or about May 9, 2023, Plaintiff was promoted to the Director of Operations ["Director"] position because of her performance. Plaintiff's performance was good enough that CRC would recommend their friends to see her as their therapist. Plaintiff was the director until her termination on June 9, 2024.

16. The former director, Brown, only trained Plaintiff for approximately one week in which she was taught the clerical functions of the position.

17. As Plaintiff continued her role, it became known to her that her job duties would encompass those of other director positions such as clinical, medical, and housing director. Because of this, Plaintiff worked well over 40 hours a week to maintain all of the different aspects of running the business.

18. During her time as Director, Plaintiff developed multiple partnerships with other therapists, hospitals, and organizations, along with other employees, patients, and their families.

19. On or about December 2023, Plaintiff had a conversation with Pressley regarding compensation for the additional roles and long hours she was performing on top of her duties as

3

Director. One of the additional roles of her job within her job was to be the therapist on call 24/7 for her behavioral health technicians.

20. Pressley responded to Plaintiff's request by asking her how much she needs to live. Plaintiff responded that she was asking for a raise due to the workload imbalance and the long hours she worked. Pressley continued to make comments about how much Plaintiff needed to make to be able to survive as a single mom. Pressley stated that he would re-evaluate her salary in April 2024.

21. Frustrated, Plaintiff removed herself from the conversation. Pressley called Plaintiff stating she could have a salary increase to $100,000.00 a year. Before Plaintiff could say she wanted to discuss the amount further, Pressley hung up the phone.

22. After Pressley hung up, Plaintiff contacted the CFO Robby (male) (last name unknown), ["Robby"] regarding discussing her salary in the annual review in April 2024.

23. In April 2024, Pressley expressed discriminatory and hateful remarks towards her and even disparaged her for being a single mother. It was as if Pressley felt that the raise awarded to Plaintiff in December 2023 negated any raise to be awarded to her. Further, no performance review was performed.

24. Plaintiff informed the owner of CRC, Neal, of the meeting with Pressley and how he acted towards her. Neal did not see any issues with Pressley's behavior and ultimately blamed Plaintiff Pressley's actions.

25. Additionally, Neal informed Plaintiff of the annual companywide directorship trip that typically included all directors. However, Plaintiff was not invited to attend because she would be the only female on the trip since she was the sole female director. His excuse was that "their

4

wives would not approve." Further, Plaintiff asked him it she could go if she looked different to which he answered with "absolutely babe."

26. Neal also stated he did not want a woman to attend because it was the only time that the men could "let loose."

27. It was often stated that the "boys club" needed Plaintiff to attend auctions and openings to ensure they had "eye candy" for these events.

28. In an attempt to blanket the underlying tension between Plaintiff and Pressley, Pressley offered Plaintiff an opportunity of a bonus structure in June 2024. Pressley stated that if Plaintiff made $400,000.00 in revenue a month, she would receive a bonus of $4,000.00, which would add up to an extra $50,000.00 a year. Plaintiff expressed her gratitude for the opportunity but pointed out that as the Director, she had little control over the revenue outside of client retention because she does not control the insurance policies that the clients had at that time. Ultimately, the conversation ended when Plaintiff explained this to Pressley. He responded with "I've always advocated for you to other people, you would think you would want to preserve that."

## ALLEGED CONCERNS

29. On or about June 6, 2024, Pressley and Clinical Director Mary Brooks ["Brooks"] held a meeting with Plaintiff about some concerns. Notably, Brooks is lateral to Plaintiff in her position but is Plaintiff's clinical supervisor for her hours working towards her licensure for LPC.

30. During the meeting, Plaintiff was told that an employee reported to them that Plaintiff had been holding clients "hostage" in her office, altering group therapy notes, and violated the HIPAA regulations.

31.     It was later revealed to Plaintiff that her coworker, Katherine Perry ["Perry"], LMSW, reported Plaintiff. Plaintiff hired Perry as a primary therapist about a month prior to Plaintiff's termination.

32.     That evening of June 6, 2024, Plaintiff received a phone call from one of her on-staff counselors. The employee reported that Perry was validating bad behavior in clients and creating a hostile work environment. Plaintiff reported these complaints to both Brooks and Pressley. Brooks replied that she would speak with Perry. Plaintiff recommended that Perry be released from her duty.

33.     The next day, Perry approached Plaintiff and accused her of violating HIPAA regulations and asked Plaintiff if she was "new" to this job. During that same conversation, Perry admitted to Plaintiff that she felt inferior to her and that she made up the accusations she brought to Brooks and Pressley.

34.     Plaintiff treated Perry with compassion for the rest of the conversation and then proceeded to report that conversation to Brooks and Pressley.

**TERMINATION**

35.     On or about June 9, 2024, Brooks informed Plaintiff that she needed to sign some paperwork regarding the conversation that happened a week prior that is mentioned *supra*.

36.     The paperwork presented to Plaintiff was actually an action plan to be implemented regarding the allegations that Perry made about Plaintiff altering group therapy notes. Plaintiff only did what she was told by Brooks. Brooks admits that Plaintiff was doing what she was told.

37.     Brooks attempted to make Plaintiff sign the papers in person after she refused to send them to Plaintiff. Brooks was trying to meet with Plaintiff, but Plaintiff had her daughter and did not have a place to take her while meeting with Brooks.

6

38.     After that conversation, Plaintiff called Pressley and when he finally answered the phone, he informed her that she needed to pack up her things and that she was being let go for prescription fraud.

39.     This was the first time Plaintiff had heard anything about prescription fraud because her role as Director does not allow her to write prescriptions, only medical staff has that ability. Notably, Plaintiff encouraged Pressley to report her for this fraud, but Pressley indicated he was not going to report Plaintiff.

40.     Pressley responded to Plaintiff that her being fired was a "done deal" and they had been investigating this all week. Notably, other staff members were told that she was fired because other employees were "dependent" on her.

41.     At this point, it was obvious that Defendant wanted to fire Plaintiff because she refused to play along with the "boys club."

42.     Brooks even told some employees that "[she] trained [Plaintiff] so I will train someone else, the program was already built."

43.     Plaintiff was terminated on June 9, 2024, for alleged prescription fraud. She was offered a severance package that she declined. Additionally, Plaintiff was initially given a termination letter that indicated she was terminated without cause. However, about a month later, Plaintiff was given a second termination letter that indicated Plaintiff was terminated with cause.

44.     Plaintiff's position as Director of Operations was filled by a male that does not have the credentials or qualifications that she has. Notably, upon information and belief, the male that replaced Plaintiff had completed the 12-step program to get clean in the past few years.

**EEOC CHARGE OF DISCRIMINATION**

45.     On or about April 7, 2025, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ["EEOC"] alleging discrimination based on sex and a claim of retaliation. Attached hereto as Exhibit A and incorporated by reference as though fully restated herein is Plaintiff's Charge of Discrimination, 494-2025-02775.

46.     Plaintiff's attorney emailed the electronically signed Charge of Discrimination to the EEOC on April 7, 2025.[1] However, the Nashville EEOC indicated it required Plaintiff's wet signature on the Charge of Discrimination. Because the EEOC employees indicated the Charge would be backdated to April 7, 2025, Plaintiff's counsel sent the Charge of Discrimination to Plaintiff for signature and then it was mailed to the Nashville EEOC office. However, the Charge of Discrimination was not back dated upon receipt. Accordingly, the EEOC received the Charge of Discrimination on April 7, 2024. *See* 29 C.F.R. § 1601.13(4)(ii)(A) ("the charge is deemed to be filed with the Commission upon receipt of the document. Such filing is timely if the charge is received within 300 days from the date of the alleged violation.") Attached hereto as Collective Exhibit B is Plaintiff's counsel's email correspondence with the EEOC. Plaintiff's EEOC Charge was therefore timely filed.

47.     On or about August 27, 2025, the EEOC's Right to Sue Letter was issued and received by Plaintiff. Attached hereto as Exhibit C and incorporated by reference as though fully restated herein is Determination and Notice of Rights. This Complaint has therefore been timely filed.

48.     On or about June 9, 2024, Plaintiff was wrongfully terminated by Defendant.

---

[1] 300 days from the termination date would be April 5, 2025, which was a Saturday. Therefore, the deadline becomes Monday, April 7, 2025.

8

49. Plaintiff's termination was the result of intentional discrimination against Plaintiff based on her sex (female).

50. Plaintiff's termination was also the result of retaliation against Plaintiff for reporting unnecessary, hostile, and discriminatory behavior of her supervisors that were all male.

51. Since her unlawful termination, Plaintiff has experienced a decline in her overall health, including, but not limited to, an increase in anxiety symptoms and depression. Plaintiff also had to uproot her life and move out of state to find a comparable job in her field of work.

52. Because of her unlawful termination, Plaintiff is now suffering an on-going loss of wages. Plaintiff had planned to work as long as she was able. She should be compensated for her wage losses and all other benefits she would have been entitled to had she remained employed.

53. The foregoing injuries set forth have been suffered and will continue to be suffered into the foreseeable future.

54. Plaintiff should be made whole for all injuries and losses suffered by Plaintiff as a proximate result of Defendant's unlawful acts.

55. Defendant has intentionally, willfully, and/or recklessly violated Plaintiff's rights. An award of punitive damages is appropriate under the law.

## **COUNT I**

56. The allegations contained in paragraphs 1 through 55 are incorporated by reference into this Count I.

57. Plaintiff filed a Charge of Discrimination (No. 494-2025-02775) with the EEOC on April 7, 2025. Exhibit A.

58. On August 27, 2025, the EEOC issued a Notice of Right to Sue on the grounds that they will do no further investigation. Exhibit C.

9

59.	This claim is therefore timely filed, and Plaintiff has exhausted all of her administrative remedies on her claim.

60.	Plaintiff's termination was based on her sex (female) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

61.	Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, attorney's fees, and expenses. In addition, Plaintiff is entitled to reinstatement to her former position if it is determined to be the proper remedy with all back pay and benefits. Finally, because of Defendant's willful and intentional conduct, Plaintiff is entitled to an award of punitive damages against Defendant.

## COUNT II

62.	The allegations contained in paragraphs 1 through 55 are incorporated by reference into this Count II.

63.	Plaintiff engaged in protected activity by reporting the discriminatory and harassing behavior of her male supervisors.

64.	In response, Defendant took adverse employment actions against Plaintiff in violation of the anti-retaliation provisions of Title VII.

65.	Accordingly, Plaintiff is entitled to a damages award against Defendant for all back pay, front pay, lost benefits, attorney's fees, and expenses. In addition, Plaintiff is entitled to reinstatement to her former position if it is determined to be the proper remedy with all back pay and benefits. Finally, because of Defendant's willful and intentional conduct, Plaintiff is entitled to an award of punitive damages against Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

1. The Court order Defendants to rescind all adverse employment actions taken against Plaintiff.

2. The Court order Defendants to make Plaintiff whole for all lost wages and fringe benefits, back pay, loss of earning capacity, front pay, and emotional distress relating to Defendants' wrongful acts of discrimination.

3. The Court order Defendants to pay prejudgment interest, tax gross-up, costs, and attorneys' fees.

4. The Court award Plaintiff all equitable relief and injunctive relief as may be appropriate including back pay and benefits and front pay if it is not feasible to rehire Plaintiff and reinstate her seniority, lost pay, and lost benefits.

5. The Court order Defendants to reinstate Plaintiff with all back pay if that is determined to be the proper remedy.

6. The Court award Plaintiff punitive damages.

7. The Court grant Plaintiff all other relief to which he is entitled.

8. Plaintiff demands a jury trial.

Respectfully submitted,

/s/ Ralph T. Gibson
Ralph T. Gibson (BPR #14861)
Alexandria R. Scott (BPR #39464)
GIBSON PERRYMAN LAW FIRM
*Attorneys for Plaintiff*
5100 Poplar Avenue, Suite 2117
Memphis, Tennessee 38137
(901) 526-0412
Ralph@GibsonPerryman.com
Alex@GibsonPerryman.com

11